Good morning, Your Honor. My name is Charles Talbot. I represent the appellant. Mr. Ghanim is appealing his denial of Social Security disability benefits, and what I'd like to do before getting into the details of this appeal is to step back just a minute and introduce Jazim Ghanim to you. Mr. Ghanim was born in Iraq. He was one of eight children. His education stopped with the ninth grade. The unfortunate thing about that is that Mr. Ghanim's family was on the wrong side of the political spectrum. He ended up being imprisoned by those loyal to Saddam Hussein. He ended up, in the course of his incarceration, being tortured and physically abused. He then managed to make his way to Saudi Arabia, where he spent a period of time in a refugee camp, and then came to this country. For the next 15 years, he worked essentially at menial-type jobs. In the course of that period of time, he became a U.S. citizen. In 2009, this abruptly came to a halt. Now, this is not a circumstance where Mr. Ghanim woke up one morning and decided he didn't want to work anymore and go on public benefits or Social Security benefits. Something happened. What happened is his brother, while assisting U.S. forces in Iraq, was killed. This struck a big blow to Mr. Ghanim. He applied for and was immediately approved for welfare benefits. For the first time since he came to America, he now had medical benefits available to him. Utilizing those medical benefits, he sought treatment. It was discovered in the course of the treatment that what Mr. Ghanim had bottled up for all these years came to the surface, with the death of his brother. He's been diagnosed with a major depressive disorder with psychotic features. He's been diagnosed with post-traumatic stress disorder. So he's receiving benefits now, correct? He is now receiving Social Security benefits. So this is all about the period of time from when he first applied to when they recently awarded him benefits, is that correct? That is correct. So, you know, your time is clicking down. So why don't you tell us, you know, give us a couple of good reasons why we should reverse what the ALJ and the district court did. I would say that the major reason is that the evidence that was relied upon by the ALJ to deny benefits was based on state agency review of the limited record as it existed at the time of their review. Isn't that the way it's supposed to work? Well, no, it's not supposed to exclude evidence. The problem is that you have to understand state agency... But they had to base it on the record, right? So your complaint isn't that they relied on the record. I take it you're complaining of something else, that they should have been doing more evidence or something. What they should have done is taken into consideration the Harborview assessment records for mental health that were developed after the state agency doctors looked at this. State agency doctors are fellows that sit in a room... Who were the state agency doctors by name? I'm sorry? Which were the state agency doctors? I tend to know the names, not their origin. Was this just Dr. Deese and Dr. Flitter or something like that? No, Dr. Deese was a doctor that the DDS asked... Right, so who were these state agency doctors? I don't remember them even existing. So state agency doctors are those doctors that reviewed Dr. Deese records. In this case, the names in this case. No, I'm looking. I remember the ALJ relying on Dr. Deese and the person who agreed with Dr. Deese, but I don't remember them relying on any state agency doctor. Yes, if you look at page 18 of the record, that's where the ALJ identifies the state agency doctors. There's a Dr. Peterson. I'm sorry, this is in the ALJ's opinion? Correct, the top of page 18. These are the people who just looked over the record, and it's not that the Harborview thing was afterwards, it's just they didn't look at them, right? They didn't have them. They had the very early records from Harborview, but there were a significant amount of mental health records in 2010. Remember, the state agency review was at the end of 2009. The two doctors who are identified as the state agency doctors you'll find at the top of page 18 in the record in the ALJ's decision. These are fellows that just sit and read documents. They don't see the claimant. They don't examine the claimant. They have no contact with this individual. On the other hand, if you look at primarily the Harborview records for the treating doctors that extend well past when the state agency doctors looked at this case, there are very severe restrictions in place in terms of Mr. Ghanim's function, severe restrictions to the extent that not just he can't do his own work that he'd done previously, but any work at all. There's a whole list of very severe restrictions dealing with the public, dealing with coworkers, getting along in the workplace, being able to stand the pressures of the workplace, being able to attend work on a regular schedule, and on and on and on. He can't do these things according to the treatment records, which for the most part were not considered by the state agency doctors. And then there were the treatment doctors, and then there was this Dr. Deese who was an examining doctor. And he, my understanding is that the ALJ relied on him with regard to cognitive issues, but that really wasn't the issue. And Dr. Deese did not really disagree with regard to mental health questions. No, in fact, Dr. Deese rated Mr. Ghanim's GAF, as I recall, between 40 and 45, and I'm sure you're aware of this global assessment of functioning scale measures and ability to function, and it indicates that anybody in this ring has major deficits in the ability to function. And then the other thing that he relied on strongly was the statement by Mr. Blatchford about he wasn't impaired psychiatrically. Well, that just doesn't make sense in view of the bulk of records where he's been treated at Harborview, people where he sits, and there's a host of them. I mean, there's a number of people with whom he receives mental health treatment, and they're looking at him face to face. And it's more to a psychiatric evaluation than just writing down what you see on a piece of paper. There's demeanor. There's attitude. There's a lot of subtle factors in looking at an individual from a psychiatric point of view. Another thing I noticed that was really misdefined was that the ALJ said that he was on no current medications, whereas, in fact, he had a bunch of medications that he brought to the hearing. Absolutely. I mean, he's on a variety of mental health medications and has been since he first gained access to medical treatment, which he got for the first time in 2009 when he went on welfare benefits and got medical coupons. That was the first time that he's been able to get regular medical treatment in this country because for the 15 years preceding that, he worked menial kind of jobs where medical benefits were simply not available. The other thing is the ALJ, finding him not credible, said that the records showed that he had a lot of new friends and he did a lot of socializing, and I couldn't figure out where is he. I couldn't follow the exhibits that said this. I know that he has this one friend who helps him, but other than that, one friend. Well, people who are foreigners in this country tend to try to hold together as a group. He has this main friend, as you point out. Right, but what else is in the record? I couldn't find anything. Not much. I think we can sort of understand to the extent that he does socialize, it's with his own kind. But there's not a lot of evidence in the record that supports who those people are, in what manner he associates with them, how long he associates with them. And the friend who you mentioned is more in the nature of a caretaker. He helps him out. He helps pay his bills. He helps him get through his appointments or remind him to go to his appointments. So it's more than just a pal. He is, in some measure, a caregiver. You have a minute left. You want to save us a little? Yes. May it please the Court. Lars Nelson on behalf of the Commissioner of Social Security. Your Honors, I would ask the Court to affirm the decision of the Administrative Law Judge because it is supported by substantial evidence. I would like to jump right into some of the questions Your Honor had about the medications and his friends, as well as the weight given to Drs. Peterson and Fitterer. As far as the medications are concerned, the ALJ mentioned medications in relation to Dr. McDuffie's opinion. No, but the part I was reading, which I just noticed, which I thought was really kind of weird, was on page 16 where he says, traditionally exam findings are inconsistent with allegations of more limiting symptoms. For example, despite no current medications on a mini mental status exam, he did such and such. But we know he had lots of medications. Yes, and that was current as of Dr. McDuffie's. I had nothing to do with McDuffie. He wasn't saying anything about McDuffie at that point. You're right. He didn't mention McDuffie by name, but Exhibit 2F is Dr. McDuffie's report, and that is the only report that he scored 30 out of 30 on on the mental status examination. By current he means not current. He means then. He means then current. And Mr. Ganeem saw Dr. McDuffie in June of 2009, so just two months after his brother died, and this was really the first assessment that he had by any mental health professional. But he's not claiming cognitive problems. I mean, that's the other problem with his assessment of Dr. Deese. He says, well, Dr. Deese says he doesn't have any cognitive problems, but Dr. Deese did say he had severe depression, and he just ignores that. Well, he does claim to have memory issues, which are not important. Well, they're often associated with depression, but he wasn't claiming that he had any cognitive problems. Certainly, Your Honor. And so then we look, what are the limitations that stem from depression? That's the Carmichael case, is how do you translate just a diagnosis, which you are not eligible for disability benefits for, into specific limitations? And Dr. Deese didn't provide any specific limitations besides the limitation to simple work. And in fact, Dr. Deese noted that for Mr. Ganeem, rapport was quickly established. He was friendly throughout the interview, and that's even if we assume that there were translator troubles. So even giving Mr. Ganeem the best reading possible of Dr. Deese's reports, it really just bolsters the ALJ's finding that although Mr. Ganeem can't interact with the public, there's no indication that he can't interact with coworkers and supervisors. Because in fact, although Mr. Ganeem says that he tends to stay in his room and not go out, his adult functional report describes him as taking daily walks. Well, I mean, I read that carefully, and in fact, he says I go out for a walk for 15 minutes a day, and I have this one friend who tells me when to go to the doctor and tells me when to take my medication and helps me cook and so on, and that's what he says he does. And I don't know, the ALJ seemed to come up with some stuff about making him look like he's going to parties all the time, and I didn't find anything in the record like that. Well, certainly, on pages 232 and 258 in the record, he mentions going to church two times a week. On page 232, he also mentions seeing friends once to twice a week. He has this one friend, we know that, who's really a caretaker, but other than that. Yeah, he mentions two friends who both have the same first name. I think it's Majid. But the record frequently discusses the friends that he has. He describes to Mr. Blatchford and Ms. Geiger that he was going to a barbecue with friends. He actually had a friend who lived with him, with his daughters. That's the same friend. It's all the same person who's essentially caretaking him. Well, I don't think the record is perfectly clear that that's, in fact, the same friend. It was clear that it was the same friend. He said, oh, he's now living with me. It's the same friend. Well, even taken as that, he describes friends who help him move, as well as friends who give him haircuts, buy him shoes. He describes a robust friendship relationship. And, Your Honor, in the context of social security disability, even if it was a rational interpretation that his friend, he only had one friend that he saw quite frequently, I think that the ALJ could have drawn an equally rational interpretation that he actually had a very robust social life, but is only bolstered by him talking about going shopping with his friend, using public transportation. And it's further bolstered by the fact that his treatment providers frequently note him to be pleasant and cooperative, and these are the same treatment providers who found that he had large social limitations. So I believe on this record it was not irrational for the ALJ to draw the conclusion that the ALJ did. The ALJ's decision is also supported in this matter by the opinions of Doctors Peterson and Fitterer. It's true that they did not review all of the medical records in this case, but they did review all the records that were before them. And importantly, they reviewed independent records. In the case of Dr. Peterson, he reviewed the record of Dr. Farmer, and Dr. Farmer found Mr. Ganim to be cooperative and found him to have no attention and concentration issues. In terms of Dr. Fitterer, she relied on the opinion of Marjorie Strom, who was a nurse practitioner. Now, this constitutes independent evidence upon which these medical doctors who are familiar with the agency's regulations base their opinions, and under this court's precedent, they are entitled to the status of substantial evidence based upon that. They also, importantly, create a conflict with the medical opinions of record. And because there was a conflict, the specific and legitimate standard applies in this matter. And because the specific and legitimate standards applies, the case law, going all the way back to Fair v. Bowen, says that the ALJ may discount opinions that are based upon subjective complaints. In the present case, that is patently obvious that they were based on subjective complaints. In terms of Dr. Eudelis Flores, her report on 319 actually says his memory is subjectively impaired, and his attention and concentration wasn't assessed. And yet she reaches the conclusion that he cannot work. As far as Mr. Blatchford, Mr. Blatchford, two months before he rendered his opinion, when Mr. Ganeen came to him and said, I would like to have a caretaker, he said he expressed surprise because to him Mr. Ganeen did not appear physically or psychiatrically disabled. He said impaired, which is obviously not true because he was taking, which he didn't, couldn't have thought was true because he was, he knew he was taking all kinds of medication for psychiatric impairments. Well, when you say not impaired, I'm sorry. He said impaired, he didn't say disabled. And it just seemed, at least it was an extreme overstatement because we know that the same person knew that he was taking a fair amount of psychiatric medication. Yes, but every prescriber, and Mr. Blatchford was not a prescriber, every prescriber noted some improvement with that medication, including Dr. Eudelis Flores just three months before she rendered her opinion. When he said he wasn't psychiatrically impaired, he must have meant something other than what you would think he meant. He was clearly impaired, otherwise he wouldn't be taking reams of psychiatric medication. Your Honor, that's certainly a possibility, but in the context of disability review. It's not a possibility. Tell me another possibility. He's taking a lot of psychiatric medication, but he's not impaired. Well, the other possibility is the conclusion that the ALJ reached, which is that he relied on Mr. Ganeem's subjective. No, I'm asking about this particular statement. That particular statement. It has to have been greatly overread. It couldn't have meant that he didn't have a psychiatric problem, even though he did have a psychiatric problem. To some degree, but Mr. Blatchford was more concerned with him accessing social services rather than actual treatment and management of symptoms. He was more like a social worker than the treating psychiatrist, Dr. Eudelis. Isn't the answer to the question that if he had impairments, the medication relieved the impairments? It's like having a headache. You take medicine and it goes away, right? Yes, certainly to some degree. So one can have a condition that medication removes the impairment. Yes, and in fact that is the where case that is discussed in our brief. That was the very point that they discussed. And unless the Court has any other questions. We're out of time. I am out of time. Unless the Court has questions. Yes. Okay. You've got a minute. Very quickly. The examination report that was done at the request of the Department of Social Health Services is significant because it was done before the state agency reviewers. And on page 209 of the record, in a range of limitations, including mild, moderate, marked, and severe, there are a list of four severe restrictions in getting along with others, getting along with the public, getting through the workday, and the like. This was available to the state agency doctors who did their review in 2009. It doesn't appear to be discussed. It appears to have been overlooked. And like I said before, there's a lot of medical records, even after their assessment, from Harborview treating folks that indicate significant issues. The other problem I have is that the ALJ seems to have plucked pieces of information out of the various reports that support no disability or support the decision. ALJ is entitled to do that. They look at the record and they reach their conclusions, and then they find support in the record to support those conclusions. But when a patient shows up to a doctor or for an assessment and he's reported as pleasant and cooperative, and yet the conclusions are that he's significantly disabled from his mental disease, this is a doctor that's sitting in front of this fellow doing a complete assessment. I don't know what ALJs expect, that he's supposed to show up like a raving lunatic, foaming at the mouth in order to get somebody's attention. I think what's important is to focus on the conclusions of the examining doctor instead of plucking out some sort of relevant comment out of the record that doesn't support the bottom line. Okay, thank you. One last comment. You're out of time. Increase in having medications that make you feel better doesn't mean necessarily a return to function. That's all. Thank you. Okay, I'm sorry, you will stand for a minute.
judges: Kozinski, Paez, Berzon